UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFE TECHNOLOGIES CORPORATION, and APPLIED BIOSYSTEMS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BIOSEARCH TECHNOLOGIES, INC., BIOSYNTHESIS, INC., and EUROFINS MWG OPERON, INC.,<br><br>Defendants._____/ | Case No. C-12-00852 WHA (JCS)<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PROTECTIVE ORDER [Docket No. 270 ]** |

## I. INTRODUCTION

On February 29, 2012, Plaintiffs Life Tech Technologies Corporation and Applied Biosystems, LLC ("Life Tech" or "Plaintiffs") filed a Motion for Protective Order (the "Motion"). Defendants Biosearch Technologies, Inc. ("Biosearch") and Eurofins MWG Operon Inc. (collectively, "Defendants") oppose the Motion. *See* Biosearch Technologies, Inc.'s and Eurofins MWG Operon Inc.'s Opposition to Plaintiffs' Motion for Protective Order (the "Opposition"). On Friday, April 27, 2012, at 9:00 a.m., a hearing was held. For the reasons stated below, the Motion is DENIED.

## II. BACKGROUND

Life Tech seeks an order from this Court disqualifying Defendants' expert witness Dr. David H. Gelfand ("Gelfand"). Specifically, Life Tech moves this Court to order that Defendants may not rely upon Gelfand as a consulting or testifying expert in this litigation and may not disclose to him or receive from him any documents or information protected by the parties' Stipulated Amended Protective Order (Dkt. 214) or otherwise protected by the Federal Rules of Civil Procedure. Motion at 1. Life Tech contends that the protective order is necessary because Gelfand has acted as a

consulting expert for Life Tech in another matter "covering related technology," and it will be significantly prejudiced if Gelfand is allowed to serve as an expert for Defendants in this case.[1] *Id.*

Life Tech argues that this Court may disqualify Gelfand as Defendants' expert witness under the test set forth in *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087 (N.D. Cal. 2004) (Fogel, J.). Motion at 5. Pursuant to that test, Gelfand may be disqualified if Life Tech can show that "(1) [it] had a confidential relationship with the expert and (2) [it] disclosed confidential information to the expert that is relevant to the current litigation." *Id.* (quoting *Hewlett-Packard*, 330 F. Supp. 2d at 1092-93). Life Tech contends it satisfies the first prong, because (1) Gelfand executed two consulting agreements with Life Tech related to other pending litigation, which both specified that Gelfand will keep information relating to his engagement confidential, (2) Gelfand and Life Tech's attorneys spoke numerous times, discussing litigation strategy, (3) Life Tech compensated Gelfand for his work. *Id.* at 5-6.

The second prong is satisfied, Life Tech contends, because Life Tech revealed to Gelfand "significant confidential information" concerning the technology at issue in the other litigation and its litigation strategy "in this field." *Id.* at 6-7 (citing Declaration of Rip Finst in Support of Plaintiffs' Motion for Protective Order ("Finst Decl."), ¶¶ 7, 10-13). Life Tech claims the confidential information is relevant to this litigation since the technologies at issue in both cases "exist in the same field" and rely upon "novel uses" of the polymerase chain reaction ("PCR") process. *Id.* at 6. Life Tech explains the alleged similarity in technology as follows,

> In the current suit, Life Tech has alleged that Biosearch infringes the patents-in-suit through its sale of dual-labeled probes used to monitor quantitative PCR. Quantitative PCR is a particular implementation of PCR that enables a user to quantify the amplification of DNA during the reaction. . . . In that other case in which Gelfand is a consulting expert, the allegedly infringing products include the use of probes that hybridize with sample DNA and are then amplified using a specific PCR method. The amplified DNA is then bound to markers for detection.

---

[1] Plaintiffs filed portions of their supporting documents *in camera*, including details of Gelfand's prior engagement with Life Tech in pending litigation. Defendants contend that the identity of the pending litigation was waived when counsel for Life Tech revealed the name of that action in an email to defense counsel. Opposition at 2 n. 3. Even if Plaintiffs waived the right to claim work product as to the identity of the pending litigation, the Court finds it unnecessary to reveal the name of that case here, especially considering that Life Tech has not disclosed Gelfand as a testifying expert in the other litigation. *See* Motion at 6.

2

*Id.*

Life Tech indicates that the Court must balance competing policy objectives in determining whether to exclude an expert witness. *Id.* at 7 (citing *Space Systems/Loral v. Martin Marietta Corp.*, 1995 U.S. Dist. LEXIS 22305, at *6 (N.D. Cal. 1995)). Plaintiffs argue that the policies of ensuring fairness and preventing conflicts of interest favor disqualifying Gelfand because of the "ongoing nature" of Life Tech's consultations with Gelfand and his exposure to Life Tech's confidential information. *Id.* In terms of prejudice, Life Tech argues that Biosearch would not be burdened if Gelfand is disqualified because Biosearch has already disclosed an additional technical expert, Dr. Fred Kramer. *Id.* (citing Declaration of Alisa A. Lipiski in Support of Plaintiffs' Motion for Protective Order ("Lipiski Decl."), ¶ 7). The identification of Dr. Kramer belies any assertion of prejudice by Biotech. *Id.* Finally, Life Tech claims its concerns are "exacerbated" by Biosearch's handling of other confidential material in this case, and Biosearch has not provided Life Tech with any assurances that it will take precautions to minimize or eliminate the risk that Gelfand will divulge Life Tech's confidential information. *Id.*

In response, Defendants argue that the *Hewlett-Packard* test favors denying the Motion. First, Defendants contend that no confidential relationship exists, or ever existed, between Life Tech and Gelfand. Opposition at 4. Defendants assert that Gelfand billed a mere 11 hours consulting on the other matter with Life Tech, which is an insufficient number of hours to constitute a "longlasting" relationship, as required by the case law. *Id.* at 4-5 (citing *Hewlett-Packard*, 330 F. Supp. 2d at 1093). During his retention, Gelfand "did not discuss any litigation strategy or infringement and his involvement was minimal," and therefore it was not objectively reasonable for Life Tech to believe it had a confidential relationship with Gelfand. *Id.* at 5. Further, Defendants maintain that Gelfand did not sign a protective order, did not submit any written expert reports for Life Tech, and received only $4,400 for his work, reflecting the minimal nature of his involvement with Life Tech. *Id.* Regarding the consulting agreement between Gelfand and Life Tech, Defendants insist that it is no longer effective considering that Gelfand's last substantive communication with Life Tech was in March of last year and that Gelfand no longer considers himself retained by Life Tech. *Id.* (citing Finst Decl Ex. C (Gelfand Consulting Invoice);

3

Declaration of Dr. David H. Gelfand in Support of Biosearch Technologies, Inc.'s and Eurofins MWG Operon Inc.'s Opposition to Plaintiffs' Motion for Protective Order ("Gelfand Decl."), ¶ 15; *Lyman v. Pfizer, Inc.*, 2011 U.S. Dist. LEXIS 97611, at *11 (D. Vt. Aug. 30, 2011)).

Defendants contend Plaintiffs do not satisfy the second prong of the test because the information provided to Gelfand by Life Tech was (1) not confidential, and (2) even if it was confidential, the information is not relevant to this case. *Id.* at 6-7. Defendants argue the information provided to Gelfand was not confidential since it consisted of, at most, "some publicly available information about different sets of patents." *Id.* Furthermore, the fact that Gelfand never signed the protective order indicates that he would not have been provided confidential information. *Id.* at 7. Defendants argue that any confidential information revealed to Gelfand in the other case—including strategies about litigation or expert retention, opinions about case strengths and weaknesses, or anticipated defenses—will be largely irrelevant to this unrelated litigation. *Id.* Defendants reject Plaintiffs' argument that because the technologies in both actions use PCR, the technologies are sufficiently related for purposes of disqualifying Gelfand. *Id.* Rather, Defendants contend, PCR is a generic process used in virtually all DNA testing to duplicate, or "amplify," DNA; the fact that it is used in both technologies does not make the subject matter of those technologies related. *Id.* at 3, 7. Defendants analogize PCR to metal used in the manufacture of automobiles, arguing that it would be inappropriate to exclude a metals expert in all cases involving the manufacturing process. *Id.* at 3.

According to Defendants, the Patents-in-Suit

> relate to probes labeled with a fluorescent reporter and a quencher that quenches the fluorescence of the reporter via Förster resonance energy transfer ("FRET"). Dkt. No. 1; Gelfand Decl. ¶ 2. The claims of the Patents-in-Suit focus on the fluorescence intensities of reporters and quenchers on a probe and how these fluorescence intensities change between the unhybridized to hybridized conformations of the probe. *See* Gelfand Decl. ¶ 8.

*Id.* at 7-8. Defendants contend that fluorescence detection of dual-labeled probes is very different from the specific technology at issue in the other litigation. *Id.* at 8 (citing Gelfand Decl., ¶ 9). Defendants also note that the technology in this case does not necessarily require PCR; rather, any form of nucleic acid amplification would suffice. *Id.*

Regarding policy considerations, Defendants argue that granting Plaintiffs' Motion would

effectively result in Life Tech having "permanently retained leading PCR expert Gelfand for only $4,400." *Id.* at 9. Concern about too easily disqualifying experts "is especially applicable to high technology patent infringement cases such as this, where courts and the public look to experts for explanations of complicated technologies." *Id.* (citing *Hewlett-Packard*, 330 F. Supp. 2d at 1098). Additionally, Defendants contend that they would be prejudiced if Gelfand is disqualified because he is the leading expert in his field and the co-inventor of TaqMan probes, the underlying technology in this case, and is irreplaceable. *Id.*

Finally, Defendants reject Plaintiffs' assertion that it has not taken any measures to safeguard Life Tech's confidential information. *Id.* at 10. Defendants note that its counsel, Rita Tautkus, asked Gelfand not to divulge any confidential information that he may have been provided by Life Tech. *Id.* at 2 (citing Tautkus Decl., ¶ 5). Gelfand has assured that he could assist Defendants without divulging such information. *Id.* (citing Tautkus Decl., ¶ 5; Gelfand Decl., ¶ 12). Additionally, Defense counsel's inadvertent disclosure of Plaintiffs' confidential materials is irrelevant in evaluating whether Gelfand can provide expert services in this litigation without disclosing confidential information. *Id.*

In their Reply, Plaintiffs dismiss Defendants' contention that Life Tech did not have a confidential relationship with Gelfand. Reply in Support of Plaintiffs' Motion for Protective Order ("Reply"), 1. Plaintiffs note that while it has submitted proof for only Gelfand's work in 2011, "[t]hat is not the totality of his work for Life Tech." *Id.* Plaintiffs also assert, *inter alia*, that it does not matter that Gelfand has never signed the protective order in the other litigation because a protective order is not required for a party to disclose its own confidential information. *Id.* at 3.

Regarding related confidential information, Plaintiffs give their own automobile analogy, offering that the relationship of PCR, as used in the technologies in both cases, "is that of an automobile's internal combustion engine—it is fundamental to the machine and makes the car more than a simple, metal cart." *Id.* at 5. While Plaintiffs insist the technologies in both cases rely on PCR and are therefore related, Plaintiffs concede that the technologies in the two cases are different. *Id.* at 6. Finally, Plaintiffs reject Defendants' assertion that Gelfand is irreplaceable, pointing to Defendants' other disclosed expert, Dr. Kramer, who appears to be similarly qualified to Gelfand.

5

*Id.* (citing Declaration of Alisa A. Lipski in Support of Plaintiffs' Reply in Support of Motion for Protective Order ("Lipski Reply Decl."), ¶ 7, Ex. A (Kramer CV)). Plaintiffs also contend that Defendants have not shown why they cannot enlist the assistance of the several co-inventors listed on Gelfand's patents. *Id.* at 6-7.

### III. ANALYSIS

#### A. Legal Standard

Federal courts have broad discretion to disqualify expert witnesses to ensure a fair and orderly trial, *see Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980), and to "protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system." *Hewlett-Packard*, 330 F. Supp. 2d at 1092 (citing *Campbell Indus.*, 619 F.2d at 27); *Erickson v. Newmar Corp.*, 87 F.3d 298, 300 (9th Cir. 1996) (commenting favorably on—without applying—rules that other courts have applied in cases in which a party seeks disqualification of an expert witness for "switching sides")) (some citations omitted). "However, disqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Id.* (citing, *inter alia*, *Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996)). The expert disqualification standard must be distinguished from the attorney-client relationship "because experts perform very different functions in litigation than do attorneys. Experts are not advocates in the litigation but sources of information and opinions." *Id.* (quoting *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1501 (D. Colo. 1993)).

There is no bright-line rule for expert disqualification. *Veazey v. Hubbard*, 2008 WL 5188847, at *5 (D. Haw. Dec. 11, 2008) (citing *Hewlett-Packard*, 330 F. Supp. 2d at 1092). Courts, however, generally disqualify an expert based on a prior relationship with an adversary if "(1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation." *Hewlett-Packard*, 330 F. Supp. 2d at 1092; *see also Veazey*, 2008 WL 5188847, at *5; *In re JDS Uniphase Corp. Sec. Litigation*, 2006 WL 2845212 (N.D. Cal. Sept. 29, 2006) (LaPorte, J.). If only one of the two factors is present, disqualification is likely inappropriate. *Id.* (citing *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, L.L.C.*, 202 F.R.D. 426, 429 (E.D. Pa. 2001)). The Court also should consider issues of

1  fundamental fairness and whether any prejudice might occur if the expert is or is not disqualified.
2  *Id.* at 1093, 1094-95. Finally, the Court should weigh policy concerns and determine whether
3  disqualification would promote the integrity of the legal process. *Id.* at 1093, 1095.

### B. Whether Life Tech had a Confidential Relationship with Gelfand

#### 1. Background Law

"The party seeking disqualification of an expert witness bears the burden of demonstrating that it was reasonable for it to believe that a confidential relationship existed," and that such a relationship became sufficiently substantial to make disqualification appropriate. *Id.* at 1093 (citing *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C.1991); *Pinal Creek Group v. Newmont Mining Corp.*, 312 F.Supp.2d 1212, 1223 (D. Ariz. 2004)). In evaluating the reasonableness of the party's belief, the Court may consider many factors, including

> whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving party funded or directed the formation of the opinion to be offered at trial.

*Id.* (quoting *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1083 (C.D. Cal. 2001)). The Court may also consider

> whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, the number of meetings between the expert and the attorneys, whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, and whether the expert derived any of his specific ideas from work done under the direction of the retaining party.

*Id.*

#### 2. Application of Law to Facts

The parties dispute whether Life Tech could have reasonably believed it had a confidential relationship with Gelfand. It is undisputed that Gelfand agreed to consult for Life Tech, signing two confidentiality agreements memorializing their relationship. Counsel for Life Tech in the other action, Rip Finst, states that he had "at least three extensive discussions with Gelfand regarding [confidential issues]" following the execution of the first confidentiality agreement. Finst Decl., ¶ 7. Life Tech, however, does not present any further evidence detailing these initial discussions. In fact,

the first entry in Gelfand's billing records, submitted by Life Tech, was not entered until May 26, 2010, and it appears to be the first in a series of entries related solely to retainer discussions. *See* Finst Decl., Ex. C (Gelfand Invoice). Substantive work and conversations with Mr. Finst do not appear in the invoice until after the second confidentiality agreement was signed. *Id.* In total, Gelfand's billing invoice shows 11 hours of consulting work for which he received $4,400 in compensation. *Id.* Although Plaintiffs assert that this "is not the totality of [Gelfand's] work for Life Tech[,]" they do not support their conclusion with sufficient evidence, such as the dates of the earlier conversations and their durations. Accordingly, the Court finds that Plaintiffs, notwithstanding the first confidentiality agreement, have not met their burden with respect to the period prior the second confidentiality agreement. *See Hewlett-Packard*, 330 F. Supp. 2d at 1094 ("Disqualification [] may not be warranted even if the expert witness has signed a confidentiality agreement" where insufficient evidence exists to determine that the party otherwise could have reasonably believed it had a confidential relationship with the expert.).

However, Plaintiffs have met their burden with respect to the period after the execution of the second agreement. Plaintiffs provide evidence of three hour-long discussions between Finst and Gelfand, where the two discussed, among other things, litigation strategy. *See* Finst Decl., ¶¶ 11-12, Ex. C. While this documented interaction is rather limited, the Court cannot conclude that Life Tech would have been unreasonable in believing it had a confidential relationship with Gelfand in light of the confidentiality agreement and the multiple confidential discussions. *See Hewlett-Packard*, 330 F. Supp. 2d at 1094 (indicating that "it is not clear" whether a single interaction with a retained expert could establish a reasonable belief in a confidential relationship).[2]

---

[2] Plaintiffs appear to argue that the second agreement is still in effect today and, as a result, a confidential relationship exists between Life Tech and Gelfand to this day. Motion at 5; Reply at 2. Gelfand does not intend to provide further consultation for Life Tech, *see* Gelfand Decl. ¶ 15, and Life Tech has not indicated that it intends to request expert consultation under the agreement. Moreover, it is undisputed that Gelfand has not provided consultation since May 2011. The Court need not decide whether the agreement is still effective today because the answer to that question is irrelevant to determining whether Life Tech could have reasonably expected, *at the time the communications were made*, that interactions with Gelfand would be confidential.

Defendants' arguments to the contrary are without merit. First, Defendants' contentions in their Opposition that Gelfand did not discuss litigation strategy and that his work was limited to merely reviewing patents are unsupported by any evidence, including Gelfand's declaration. Second, Defendants' argument that it was unreasonable to believe a confidential relationship existed because Gelfand did not sign a protective order is irrelevant to determining whether Life Tech was reasonable in believing *its* confidential information was protected. Third, Defendants' assertion that 11 hours and $4,400 in compensation "indicates the minimal nature of [Gelfand's] involvement with Life Tech[,]" is conclusory and ignores the operative question of whether the substance of the interactions—even if limited—could establish a confidential relationship. Finally, Defendants' reliance on *Lyman*, 2011 WL 3843956, is misplaced. The court there found that a four-year lapse from when the expert last performed work for the party moving to disqualify him was relevant in determining the second prong; namely, whether the information could still be considered confidential. *See Id.* at *3. The one-year lapse in time here, however, is not relevant in determining whether Life Tech was reasonable in believing it had a confidential relationship with Gelfand at the time he was consulting for Life Tech.

### C. Whether Life Tech Disclosed Confidential Information to Gelfand that is Relevant to the Current Litigation

#### 1. Background Law

Confidential information essentially is "information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege.'" *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (quoting *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 278 (S.D. Ohio 1988)); *see also In re JDS*, 2006 WL 2845212, at *3. It could include

> discussion of the party's "strategy in the litigation, the kinds of experts [the party] expected to retain, [the party's] view of the strengths and weaknesses of each side, the role of each of the [party's] experts to be hired and anticipated defenses." *Mayer*, 139 F.R.D. at 4; *see also Pinal Creek Group*, 312 F. Supp. 2d at 1224. Thus, at least one court has concluded that "[c]ommunication based upon technical information as opposed to legal advice is not considered privileged." *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191–92 (S.D.N.Y. 1988).

*Id.* (alterations in original). "Unlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged." *Id.* (quoting *Stencel*, 174 F. Supp. 2d at 1083). Because the burden is on the party seeking disqualification, that party should point to "specific and unambiguous disclosures that if revealed would prejudice the party." *Id.*; *see also Greene, Tweed*, 202 F.R.D. at 430 ("[T]hat the proposed experts were involved in the development of technology which was 'operationally similar' to the infringing products or 'which evolved into the [technology] used in the [infringing products] is not enough." (quoting *Space Systems/Loral*, 1995 WL 686369, at *2-3)). Conclusory assertions are not enough. *In re JDS*, 2006 WL 2845212, at *3; *Greene, Tweed*, 202 F.R.D. at 429.

### 2. Application of Law to Facts

As noted above, the parties dispute whether any relevant confidential information was disclosed to Gelfand following the execution of the second agreement. In Plaintiffs' moving papers, they state that Gelfand's consultations with Life Tech included development of litigation strategy and infringement theories and claims. *See* Motion at 6; Reply at 3. Additionally, Life Tech's counsel in the other matter, Mr. Finst, submitted a declaration that purports to reveal, *in camera*, further confidential information disclosed to Gelfand. *See* Finst Decl. Defendants' insistence that no confidential information was exchanged ignores Plaintiffs' statements in their Motion, and is unsupported by Gelfand's declaration, in which he does not deny he was given confidential information. *See* Gelfand Decl. ¶ 12 (stating that he could work for Defendants without revealing confidential information he may have received from Life Tech).

However, even if confidential information was disclosed to Gelfand, including trial strategy, Plaintiffs' moving papers and the Finst declaration fail to establish that such information is relevant to this litigation, which involves different parties, litigating different patents, and claiming different technologies. *See Bone Care Int'l, LLC v. Pentech Pharms., Inc.*, 2009 WL 249386, at *3 (N.D. Ill. Feb. 2, 2009) ("[A]n expert's exposure to litigation strategy in an unrelated and different action is insufficient to warrant the extreme sanction of disqualification." (quoting *Chamberlain Group, Inc. v. Interlogix, Inc.*, 2002 WL 653893, at *4 (N.D. Ill. Apr. 19, 2002))). Plaintiffs do "not dispute that

the technologies in the two cases are different." Reply at 6. However, Plaintiffs argue that the two technologies are nevertheless related because they "exist in the same field" and rely upon "novel uses of the PCR process." Motion at 7. Plaintiffs' argument proves too much. Even if both technologies "rely on the engine of PCR," the Court cannot conclude that such a superficial similarity, without more, means Gelfand received *relevant* confidential information and is therefore disqualified. To take the automobile analogy exchanged by the parties, Plaintiffs' insistence that PCR is like a car's engine, essential to the car's purpose, would mean that an automotive expert would be disqualified from opposing a party he had formerly consulted for, even if the two matters involved completely different aspects of the car, simply because all aspects of the car fundamentally rely on the same thing—the internal combustion engine. Such an outcome is clearly unwarranted under this Court's requirement that the confidential information be relevant to the present litigation. *See In re JDS*, 2006 WL 2845212, at *3-4; *see also Bone Care*, 2009 WL 249386, at *3 (refusing to disqualify expert in patent infringement case where no evidence showed an overlap in the technical subject matter *at issue* in the litigations).

      The Court finds that Plaintiffs' declaration, submitted *in camera*, and their moving papers, are unspecific and ambiguous with respect to the disclosures Life Tech allegedly made to Gelfand. Moreover, Plaintiffs fail to explain with particularity how they would be prejudiced by Gelfand's disclosure of confidential information to Defendants. Indeed, it is not apparent to the Court how the disclosure of confidential information as it relates to the technology in the other action—"the use of probes that hybridize with sample DNA and are then amplified using a specific PCR method"—would prejudice Plaintiffs in this action, which involves "dual-labeled probes used to monitor quantitative PCR." Motion at 6. Besides Plaintiffs' vague assertions to the technologies' shared use of the PCR process, Plaintiffs offer no explanation. Accordingly, the Court finds that Plaintiffs have not met their burden in showing that Life Tech revealed confidential information to Gelfand that is relevant to this litigation.

### D. Whether Issues of Fundamental Fairness and Prejudice Favor or Disfavor Disqualification

#### 1. Background Law

In addition to the two factors, this Court must consider whether its decision will be prejudicial or fundamentally unfair to either of the parties. *See Hewlett-Packard*, 330 F. Supp. 2d at 1095; *Veazey*, 2008 WL 5188847, at *7. As part of this consideration, the Court may ask "whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert." *Id.* (quoting *United States ex rel., Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F.Supp. 244, 251 (D.N.J. 1997)). Consideration of prejudice is especially appropriate at late stages in the litigation, at which time disqualification is more likely to disrupt the judicial proceedings. *Id.*

#### 2. Application of Law to Facts

Plaintiffs contend that Defendants would not be prejudiced if the Court were to disqualify Gelfand because they have other options for their expert consulting needs, including Dr. Kramer, who Defendants have already disclosed as one of their proposed experts. Plaintiffs further assert that Defendants' retention of Gelfand "appears to be based solely on gamesmanship rather than necessity." Reply at 6. Defendants counter that they would be prejudiced by the disqualification of Gelfand because he is the leading expert in the field and the co-inventor of TaqMan probes, the technology at issue in this case.

The Court finds that, even if Gelfand could be substituted with another expert without any, or only minimal, prejudice to Defendants, Plaintiffs have not demonstrated sufficient prejudice or fundamental unfairness *to them* "to prompt the Court to interfere with [Defendants'] interest in successfully litigating this action." *Hewlett-Packard*, 330 F. Supp. 2d at 1097. As discussed above, Plaintiffs have not sufficiently shown how they would be prejudiced in this action by Gelfand's revelation of Life Tech's confidential information. The Court also declines to interpret Defendants' retention of Gelfand as an effort to gain access to Life Tech's confidential information rather than as a legitimate litigation decision.

### E. Whether Policy Concerns Favor or Disfavor Disqualification

#### 1. Background Law

Finally, the Court should consider policy concerns in order to achieve the goal of protecting the integrity of the adversary process and of promoting public confidence in the legal system. *Id.* at 1095. Such concerns include consideration of the parties' strategic positions, and avoidance of creating "troublesome incentives for both experts and the retaining party." *Id.* (quoting *Pinal Creek Group*, 312 F. Supp. 2d at 1227) (other citations omitted). For example, "if experts are permitted to breach confidentiality agreements, they might be motivated 'to sell their opinions to the opposing parties or the highest bidder without concern about the potential confidentiality of their previous consultations.'" *Id.* The retaining party might be motivated "not to withdraw a previously designated expert while litigation is pending for fear that the party's confidential information would become available to its adversary." *Id.* (quoting *Pinal Creek Group*, 312 F. Supp. 2d at 1227–28). On the other hand, if "experts are too easily disqualified, unscrupulous attorneys may attempt to create relationships with numerous potential experts at a nominal fee hoping to preempt the ability of their adversaries to obtain expert assistance." *Id.* (quoting *Stencel*, 174 F. Supp. 2d at 1083).

#### 2. Application of Law to Facts

Policy concerns also weigh in favor of denying the Motion. Disqualifying an expert based on unrelated confidential information he previously obtained from the opposing party would undermine, not promote, the integrity of the legal process. Without venturing into Life Tech's motivations, the Court notes that if Gelfand can be disqualified in this case, parties in other cases might be tempted to create a purported conflict for the sole purpose of preventing their adversaries from hiring particular experts. *See Id.* at 1098. This Court in *Hewlett-Packard* explained that

> this concern is especially important in high-technology patent infringement cases, in which the courts, as well as the public, rely on experts to explain complicated technologies. Permitting one party to lock up all or most of the best experts might interfere with the proper interpretation of claim language . . . as well as fair evaluation of the merits of claims of infringement.

*Id.* Additionally, disqualifying Gelfand in this case will impair his ability to practice his trade as an expert witness. *See Id.* If Plaintiffs' broad conception of relatedness were adopted in this case, it is not clear to this court that Gelfand would ever be able to oppose Life Tech in any matter.

## V. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Protective Order is DENIED.

IT IS SO ORDERED.

Dated: May 7, 2012

_____

JOSEPH C. SPERO

United States Magistrate Judge